TESLA ELECTRIC CO. v. SCOTT et al.

(Circuit Court, E. D. Pennsylvania.  September 27, 1899.)

No. 28.

**1. PATENTS—INVENTION—ELECTRO-MAGNETIC MOTORS.**

The Tesla patents, No. 511,915, for electrical transmission of power, and No. 555,190, for an alternating motor, both of which relate to electro-magnetic motors operated by alternating currents of electricity, considered, and each *held* to involve invention, in view of the prior art, including the other patents in suit previously granted or applied for, and also the prior patents to the same inventor relating to the same subject-matter.  Each of said patents also *held* infringed.

**2. SAME—SUIT IN EQUITY FOR INFRINGEMENT—DEFECT OF PARTIES.**

The objection that complainant in a suit for infringement of a patent has assigned his interest therein to one who is not joined as a party complainant, when not taken by the pleadings, and first urged on the hearing, will not be deemed ground for dismissing the bill, which would only result in requiring a second trial of the same issues, but the complainant will be given leave to join his assignee.

This was a suit in equity by the Tesla Electric Company against Scott & Janney and others for infringement of certain letters patent relating to electro-magnetic motors.

Kerr, Page & Cooper, for complainant.

Alexander & Magill and Albert H. Walker, for respondents.

McPHERSON, District Judge.  The defendants are charged with infringing letters patent Nos. 511,915 and 555,190, granted to the plaintiff as assignee of Nikola Tesla.  The patents relate to electro-magnetic motors operated by alternating currents of electricity, and the points in controversy cannot be understood without a brief preliminary consideration of certain properties manifested by the electric fluid.  I condense the following account from the brief of plaintiff's counsel, understanding that no objection is made by the defendants to the accuracy of the theory now to be repeated:

Suppose two coils of insulated wire, A and B, to be wound in opposite directions, and placed at two points on a soft iron bar, C. If a current of electricity be passed through either coil, or through both coils, the bar will become a magnet for the time being.  If a current of given direction be passed through coil A alone, a north pole will be thus produced at one end of the bar, and a south pole at the other end.  The same current passed through coil B alone will also produce north and south poles, but in reversed positions. If the same current be passed through both coils at the same time, a north pole will be produced in the bar midway between the coils. If the current through coil A is weaker than the current through coil B, the stronger current will have more influence upon the position of the pole, and will fix it nearer to A than to B.  If the stronger current be shifted from A to B, the position of the pole will also be shifted to a point nearer to B than to A; and thus, by increasing

and decreasing from zero to maximum the relative strength of the currents through the respective coils, the pole may be made to travel backward and forward from one end of the bar to the other. If, therefore, a magnetic bar or armature, D, be suspended near the bar, and be free to move, it will inevitably follow the pole in this backward and forward movement. The bar need not be continuous, and need not be straight. It may be bent into the form of a ring. Soft iron forms a better path for the magnetic lines that flow from the coils than the air affords; but the lines will pass through the air for some distance, and therefore the middle section of the bar may be removed, leaving only the sections that are surrounded by the coils, or the bar may be removed altogether. In either event the armature, D, will still be affected magnetically, while its movement may be less obstructed. The partial removal of the bar may therefore be an important physical advantage. The movement of the armature will depend upon the relative strength of the magnetizing influences of the coils, and upon the forces that may be set in motion by these influences.

If, therefore, the pole is to shift uniformly, and is thus to produce a uniform magnetic attraction, the electric current passing through each coil must vary in strength, and must vary uniformly. There must be a definite relation between the two currents, and this relation must be constant in all the changes in strength that the currents undergo. Tesla discovered—and the discovery has been of vast importance—how to use alternating currents of electricity so as to bring about this uniform shifting of the poles or attractive forces in a motor, and thus to cause the rotation of an armature, and the consequent transmission of power.

A continuous current of electricity flows in one direction only, and in its course does not vary much in strength. An alternating current flows backward and forward, and in its course varies in strength four times between zero and maximum. It begins at zero, increases in a given direction to maximum, decreases again to zero, increases to maximum, but now in the opposite direction, and finally decreases once more to zero. The following curve will serve to illustrate what takes place:

The application of alternating currents in the operation of motors will be best shown by examining another of Tesla's patents, No. 381,968. Fig. 3 of this patent shows a generator of alternating currents, and a motor connected therewith. In this motor the soft iron bar, C, is bent into the shape of a ring, around which are wound two pairs of magnetizing coils, A and B, arranged alternately. The armature, D, is centrally mounted within the ring, and is free to

revolve upon this central axis. If a current be passed through coil A alone, a horizontal line of polarization will be developed in the core, C. A similar current through coil B alone will develop a vertical line of polarization, while currents of equal strength passed through both sets of coils at the same time will produce a resultant line of polarization that will be diagonal in direction, midway between the horizontal and vertical lines. If the two currents be applied at the same time, but varying in strength and direction, the poles will travel around the ring, and the shifting magnetic attraction, or rotating field, will draw the armature after it. The necessary variations in the strength and direction of the two currents are produced in the generator. What takes place there is thus detailed in the account I have been following:

"E and F, in said generator, are two field-magnet poles; G, a cylindrical armature mounted to rotate between them; and H, K, two coils wound on the armature at right angles to each other.

"It is well known that, when any coil is moved in a magnetic field so as to cut at right angles the lines of force extending between the poles, a current is developed in the coil, which depends for direction upon the direction of movement of the coil with respect to the magnetic lines, and for strength or potential upon the number of lines cut per unit of time.

"In any given generator, therefore, such as that shown in Fig. 3, in which the magnetic lines may be assumed to extend across, in parallelism, from one pole to the other, an armature coil, H, moving through such a field in a circular path, will, at one instant of time, cut no lines of force, since its direction is parallel to the direction of the lines. At such instant the coil is developing no current, and is said to be in the neutral position.

"At another point in its path, 90 degrees from the neutral point, the coil is cutting the lines of force at right angles. It is then said to be in the maximum position, because its direction is such as to cut the greatest number of lines per unit of time, and therefore to produce the maximum current. At every intermediate point in its path, from the neutral to the maximum points, it is evident that the coil will cut a gradually increasing number of lines of force in a given angular movement, and will in consequence develop a current which rises from zero to maximum.

"The coil, in passing beyond the maximum point, develops gradually less current until it reaches a point 180 degrees from the start, where it is again said to be at the neutral point, and its current is nil. In moving through the next 180 degrees of arc, the action above described is repeated, but the direction of current is reversed, since the coil is moving in the opposite direction across the lines of force. When the coil has returned to the assumed starting point, it has undergone a complete cycle of changes, and a current has been developed which, in potential and direction, corresponds throughout to the position and movement of such coil. These cycles of current may therefore be regarded as divided into 360 degrees, and we may express the relations of any two of such currents by a statement of their relative displacement as measured by such a scale. Thus, two currents are said to be in phase when they rise and fall simultaneously, and in the same direction. They are said to differ by 90 degrees, or a quarter of a cycle or phase, when one begins to rise from zero positive at the instant that the other begins to fall from maximum positive, and so on.

"In the generator under consideration the coils H and K, having an angular displacement of 90 degrees, will generate alternating currents different by 90 degrees, or a quarter phase; or, in other words, the periods of maximum current in one coil coincide with those of minimum current in the other, and conversely. If, then, the generator coils, K and H, be connected in circuit with motor coils, A and B, respectively, the resulting action will be as shown in the accompanying series of figures:

Fig. 3.

"Starting with the generator coils in the position indicated in Fig. 3, the current in coil H is practically nil, whereas the coil K is at the same time developing its maximum current; and, since the last-named coil is in circuit with motor coils, B, a magnetization of the ring, C, results, the poles being in a vertical line, N, S.

"When the generator coils have made one-eighth of a revolution, and reached the position indicated in Fig. 4, both will be generating currents which, owing to the position of the coils in the field, will be of equal strength. Both

Fig. 4.

pairs of motor coils, A and B, will therefore receive equal currents; and the poles, resulting from the conjoint magnetizing effect, will have advanced along the ring to a position corresponding to one-eighth of the revolution of the armature of the generator.

"In Fig. 5 the armature of the generator has progressed to one-quarter of a

Fig. 5.

revolution. At the point indicated the current in the coil H is maximum, while in K it is nil, the latter coil being in its neutral position. The poles of the ring will in consequence be shifted to a position 90 degrees from that at the start, as shown. In like manner the conditions existing at each successive eighth of one revolution are shown in the remaining figures, a short reference to which will suffice for an understanding of their significance. Fig. 6 illustrates the conditions which exist when the generator armature has com-

Fig. 6.

pleted three-eighths of a revolution. Here both coils are generating current, but the coil K, having now entered the opposite field, is generating a current in the opposite direction, having the opposite magnetizing effect; hence, the resultant pole will be on the line, N, S, as shown. In Fig. 7 one-half of the revolution of the armature of the generator has been completed, with the re-

Fig. 7.

sulting magnetic condition of the ring as shown. In this phase coil H is in the neutral position, while coil K is generating its maximum current, which is in the same direction as in Fig. 6. The poles will consequently be shifted through one-half of the ring. In Fig. 8 the armature has completed five-eighths of a revolution. In this position coil K develops a less powerful current, but in the same direction as before. The coil H, on the other hand, having entered a field of opposite polarity, generates a current of opposite direction. The resultant pole will therefore be in the line, N. S; or, in other words,

Fig. 8.

the poles of the ring will be shifted along five-eighths of its periphery.   **Fig. 9**
**in** the same manner illustrates the phases of the generator and the ring **at**

Fig. 9.

three-quarters of a revolution;  and Fig. 10, the same at seven-eighths **of a**

Fig. 10.

revolution of the generator armature.  *  *  *  When a complete revolution
is accomplished, the conditions existing at the start are re-established, and the
same action is repeated for the next and all subsequent revolutions;  and, in
general, it will be seen that every revolution of the armature of the generator
produces a corresponding shifting of the poles, or lines of force, around the
ring.

97 F.—38

"As the poles of the motor shift, the armature follows; and it will be seen that, in any motor in which a progressive shifting of the poles or points of attraction is produced, there must be a constant drag or pull upon the armature, tending to set and maintain it in rotation."

As already stated, a continuous bar or ring is not essential, and therefore a rotating field may be produced in a motor of the form shown on page 11 of the brief.

Fig. 11.

"This motor has four poles, 1, 2, 3, 4, projecting inwardly from a ring, C, which may be of iron, brass, wood, or any other material. The poles 1 and 2 are energized by coils, A, which are in one of the circuits from a generator of the same construction as that above described, while poles 3 and 4 are energized by coils, B, in the other circuit of said generator. The currents in the two circuits differ by a quarter phase.

"In such a motor the coils A at a given instant are receiving the maximum current from the generator; and, we will assume, are imparting to the cores which they surround the maximum magnetization. At this moment the poles 3 and 4 will be neutral, since no circuit is flowing in the coils B. An armature, D, therefore, will tend to place itself in the path of the greatest number of magnetic lines, or, obviously, in line with poles 1 and 2.

"Following the phases of the two currents, however, the magnetism of the poles 1 and 2 then decreases, while that of poles 3 and 4 increases, with the result that the attraction of poles 1 and 2 for the armature becomes less, while that of poles 3 and 4 becomes greater, and the armature turns in obedience to the shifting resultant of these two forces. Then, with a change of polarity, the rise and fall of magnetism in the two sets of poles, respectively, continue, as will now be understood."

What has been said will explain Tesla's theory of polyphase alternating current motors.

"His broad invention, expressed in a few words, was the production, by means of two or three alternating currents, differing in phase, of a shifting or rotating magnetic field, as distinguished from one in which the poles, or points of maximum attraction, were merely alternated in polarity, either with or without variation in strength.

"In other words, if the two alternating currents which energize such a motor as that shown in Fig. 11 were exactly in phase, or, what would be the same thing, if the motor were energized by a single alternating current, the magnetism of the poles would rise, fall, and reverse at the same instants of time. Such a motor is capable of maintaining rotation of the armature if the latter be brought, by the application of power, up to a speed corresponding to the rate of alternations of the energizing current. But such a motor will not start

from a state of rest, because there is no rotary effort, or torque, exerted by the field upon the armature, but only a force tending to keep the armature in a fixed position with relation to poles of given sign.

"The moment, however, that a time interval occurs between the periods of magnetization of adjacent poles, such as would result from energizing such poles by currents differing in phase, or any other cause, a rotative tendency is created, due to the shifting or swinging of the magnetic resultant from that pole which reaches its maximum first towards that which reaches it later."

The effect produced by such a motor is the same as would be produced if the poles of permanent magnets were presented to the armature, and the magnets themselves were revolved bodily around it.

The attraction between the armature and the rotating magnetic field may be intensified by placing on the armature itself closed or short-circuited coils. The nearness of the magnetic field will induce currents of electricity in these closed coils, which will thereupon magnetize the armature, and increase the attractive effect between the armature and the field. This feature is a subject of patent No. 382,279 (not now in dispute), and may be further explained as follows:

Fig. 12.

"Let A, in Fig. 12, designate a magnetic body mounted on a central shaft, and having a number of polar projections, B, each of which is surrounded by a short-circuited or closed coil or conductor, C. Let D represent a permanent magnet having a north and a south pole, N, S. If, now, the magnet, D, be moved rapidly around the periphery of the magnetic body, A, in the direction of the arrow, while A is held stationary, it is obvious that the passage of its poles in front of the polar projections, B, will cause lines of force to pass into and out of the projections, and these lines threading the closed coils, C, will develop electric currents in said coils. This is what happens in any magneto-electric generator in which the armature coils are moved through the magnetic lines of the field, or the latter are moved through the coils.

"The currents developed by this means will magnetize the cores which the coils surround, and as the development of such currents and the resulting magnetization cannot occur simultaneously with the passage of the poles, but must lag somewhat after it, there will always be magnetized portions in the armature behind the moving poles, and endeavoring to catch up with them. If the armature be free to rotate, there will be between the magnetic poles in the armature, due to the currents induced in the closed coils and the moving poles of the magnet, D, a torque or mutual attraction tending to produce rotation very much greater than would exist between the magnet, D, and the armature, A, if the coils, C, were not present.

"If, instead of moving bodily a magnet, D, around the armature, its action

be imitated by the shifting poles in a ring, or the shifting resultant between polar projections produced by two alternating currents of different phase, the same result would follow, and we should have the highest development of the Tesla motor."

In such a motor as has now been described, the most favorable condition for operation exists when the two currents differ in phase by 90 degrees, or a quarter of a period. To obtain this condition, the currents must proceed from independent sources. They may proceed from different machines, or from different coils in the same machine. In the patents of May 1, 1888, preceding those in suit, the currents were furnished by two complete circuits extending from the generator to the coils of the motor. At that time, however, all alternating-current apparatus was designed for a single circuit, and therefore a Tesla motor could not be used with such apparatus. In order to meet this objection, Tesla devised several schemes by which his motors could be operated by a single circuit. He proposed to split a current into two currents, and to produce a sufficient difference in phase between them to secure the necessary rotating field. For present purposes, only two methods of obtaining the desired result need be considered:

"(1) Splitting a single current into two currents, and obtaining the requisite difference of phase by induction.

"(2) Splitting a single current into two currents by dividing the path of a single current, and obtaining the requisite difference of phase by making the two branches of the main path of different electrical character."

The first method is thus explained:

"If a current be flowing in a conductor, it sets up in the vicinity of such conductor a condition known as a 'field of force.' If another conductor be placed within the influence of this field of force, and parallel to the first, a current will be developed or induced in it by any change that takes place in the strength of the current in the first. But such induced current will not be in phase,—that is, in step with the changes in the original current,—for the reason that the force which causes it to flow is in proportion to the rate of change of the original force. There are obvious complex considerations attending this phenomenon, but for present purposes it is sufficient to accept the general proposition that, whenever one conductor is brought within the inductive influence of another, any change in the current in one conductor induces a current in the other with corresponding, but later, changes.

"Tesla conceived the idea of utilizing this law for the production of a rotating field motor capable of being run from a single circuit.

"Applying this principle to the operation of his motor, he connected one of the energizing circuits directly with the main circuit of a single-phase generator, and near the motor formed the wire of the main circuit into a coil, which he surrounded with a second coil connected with the other motor circuit. By this means there was induced in the second motor circuit a current similar to that which flowed through the first circuit directly from the main line, but later in phase, and, as explained above, this would necessarily result in the operation of the motor."

The second method is as follows:

"A circuit offers to the passage of an alternating current two kinds of resistance,—one known as dead, or ohmic, resistance; the other known as live, or active, resistance. The first is dependent solely upon the length and area of cross-section of the conductors forming the circuit, and upon their specific resistance; that is, upon the kind of metal or material of which they are composed. Copper, for instance, has a low specific resistance, while German silver has a high specific resistance; which simply means that, for a given length

and cross-section of conductor formed of the two metals, copper will oppose to the passage of the current a much lower dead resistance than will the German silver.

"Active or live resistance is of an entirely different character, and is the result, to use a rough analogy, of a sort of inertia which is characteristic of the circuit, and which varies with the arrangement. To carry the inertia analogy still further, it may be said to be comparable to the inertia resistance which is opposed to the attempt to move suddenly on its hinges a heavy door. It is a commonly-observed fact that, if an attempt be made to push open a heavy door, however free from friction its hinges may be, the door will not immediately move in response to a pressure exerted upon it, but the motion will lag behind the pressure exerted; but, having once begun to move, it will continue to swing, and will resist an attempt to stop it, so that a pressure in the opposite direction must be exerted for some little time before the motion of the door is reversed. If an attempt were made to swing such a door back and forth, its motion would always lag behind the pressures exerted upon it.

"In a similar or analogous manner, when an attempt is made to send a rapidly varying alternating current through a circuit, the circuit at first resists the flow of the current; and, the current having once started, the circuit resists any change in its strength or direction. This property of a circuit is known as 'self-induction.' It results, therefore, that, where self-induction exists in a circuit, there is a delay, or lag, or displacement of phase, between the current flow and the pressure tending to produce it; and this delay is due to the live resistance, or electro-motive force of self-induction. The analogy just used may be carried still further, and the dead resistance of the circuit may be compared to the friction of the hinges. If there were no resistance opposed to an attempt to move the door, except the friction of the hinges, the door would begin to move the instant a pressure greater than the friction were exerted, and would stop when the pressure ceased; and, in a similar way, the dead resistance of the circuit opposes no varying resistance, and does not delay the current. If the door have both a large inertia and a large friction, the inertia resistance or active resistance will be proportionately less, and a proportionately less force will be exerted in starting it, and it will continue to swing for a shorter time after the force is removed; that is, it will stop quicker. Its delay will therefore be less. In a somewhat analogous manner, an increase of the dead resistance of a circuit will make the effect of its active resistance relatively less, and the delay or lag of the current less.

"Tesla also conceived the possibility of utilizing these facts in the production of a rotary field motor capable of being run by a single circuit, and carried out this conception by dividing a single circuit of alternating current into two branches at the point where the motor was located, and using these two branches as independent circuits to energize the motor. Then, in order to secure a difference of phase between the currents flowing in said branches, he made them of different electrical character; that is to say, by the introduction of some means in one to increase its self-induction or inertia, he retarded the current therein to a greater degree than in the other."

This brings us to the patents in suit, which have to do with "split-phase" motors. The applications were made, and the patents were granted, on the following dates:

No. 555,190, for an alternating motor, was applied for on May 15, 1888, and was granted February 25, 1896.

No. 511,915, for a method of electrical transmission of power, was applied for on May 15, 1888, and was granted January 2, 1894.

The patents stand upon the same application, which was divided in December, 1888, and are attacked together on the ground that they are void for want of invention. It is argued that in view of the prior state of the art, and especially in view of Tesla's patent No. 382,279, of May 1, 1888, the step from obtaining separately from the generator the two alternating currents, different in phase, that are required to

operate the motor described in No. 382,279, to obtaining only one of such currents from the generator, while the other is obtained by induction from the primary current, was an obvious step, easy to be taken by any one possessed of skill in electrical engineering, and therefore did not involve invention. Upon this point the opinions of the experts do not agree, and I am so little of an expert myself in this difficult branch of science that I scarcely feel entitled to have or express an independent opinion. Nevertheless, I have given the subject such consideration as lay within my power, and have come to the conclusion that the step was taken in the exercise of invention. The grant of the later patents is prima facie evidence of novelty and invention, as has often been decided; but, aside from this presumption, so far as I can realize the situation before and after May 1, 1888, the two patents now attacked seem to me to be so connected with the earlier group that the same faculties that were necessary to produce those that are first in point of time must have continued in exercise to produce those that followed. It is often very difficult to draw the line between invention and skill, and different minds may draw it at different points. I submit my own conclusion for what it may be worth.

Another defense asserts that the disputed claims of No. 555,190 are invalid because they are identical with the claims of No. 445,207. If the claims in both patents are for the same inventions, the position is sound; for No. 555,190, although first applied for, was not granted until more than five years after No. 445,207. But I do not think the inventions are the same. The claims are certainly not expressly alike, as will be seen at once; and their identity must be found, if at all, in what is implied by the claims of No. 555,190. Upon this point the testimony is in conflict, and my examination of the opposing views has led me to the conclusion that the defendants' position has not been sustained. I think the plaintiff's argument is sound, as thus expressed on page 42 of the brief:

"The distinction between the inventions claimed in these two patents resides in the fact that in No. 445,207 the two circuits of the motor are, as stated in claim 1, of different electrical character or resistance; in claim 2 they are of different self-induction; while in claim 3 one set of the energizing coils is formed of conductors of small size and few turns, while the other is a conductor of larger size. None of these three requirements is found in either of the claims of patent 555,190, and therefore the two patents are not for the same invention. Moreover, while it is true that claims 1, 2, and 6 of patent 555,190, which are the claims relied upon by the complainant herein, do cover the construction set forth in patent 445,207, yet, on the other hand, the invention of said claims can be embodied in motors which do not contain the invention claimed in patent 445,207, because it is quite possible to make the circuits of the motor of 555,190 of the same electrical character or resistance, and of the same self-induction, since the difference in phase in such a motor would be secured by the induction of one current from the other. In fact, the motor shown and described in patent 555,190 does not embody the inventions of the claim of patent 445,207."

Another defense sets up patent No. 511,559, granted December 26, 1893 (not hereinbefore referred to), as a sufficient answer to the validity of No. 511,915, granted January 2, 1894; the position being that both patents are for the same invention, and therefore that the

patent later in date is void. This defense was not set up in the answer, and for this reason objection is made to its consideration. It is not necessary to pass upon the objection, however, since I do not think that the defense should prevail. The claims of No. 511,559 are as follows:

"(1) The method of operating motors having independent energizing circuits, as herein set forth, which consists in passing alternating currents through both of the said circuits, and retarding the phases of the current in one circuit to a greater or less extent than in the other.

"(2) The method of operating motors having independent energizing circuits, as herein set forth, which consists in directing an alternating current from a single source through both circuits of the motor, and varying or modifying the relative resistance or self-induction of the motor circuits, and thereby producing in the currents differences of phase, as set forth."

And the disputed claim of No. 511,915 is in this language:

"(1) The method of operating electro-magnetic motors having independent energizing circuits, as herein described, which consists in passing an alternating current through one of the energizing circuits, and inducing by such current the current in the other energizing circuit of the motor, as set forth."

I think the earlier patent claims (1) a generic method of operation by difference of phase; and (2) a specific method of obtaining that difference, namely, by "varying or modifying the relative resistance or self-induction of the motor circuits,"—while the disputed claim of No. 511,915 claims a different method of obtaining the difference in phase, namely, by induction. As already pointed out, induction and self-induction are different things.

The last defense is noninfringement. To this point much of the testimony has been directed, and the subject has received the most careful attention in my power. It has not been easy to understand, as will immediately appear to any one who undertakes its examination. The defendants' counsel describes it as "one of the most abstruse departments of electricity," and he rightly speaks of the principal testimony on this point as "two elaborate and highly technical scientific expositions." Fortunately the oral arguments and the briefs of counsel have presented the opposing views with such admirable clearness and force that I think I have been able to understand the disputed points sufficiently to choose between the antagonistic theories. The difficulty is, of course, increased by the fact that the operations of the electric fluid are not visible. We see only the phenomena that result from such operations, and can only form an opinion, more or less probable, concerning the actions and reactions that co-operate to produce the phenomena. Upon many points opinions agree. Upon other points there is at present a wide divergence. Such divergence exists among the witnesses who have testified concerning the electrical and magnetic forces that combine to cause the armature of the defendants' motor to revolve, and I cannot give the reasons by which they support their respective conclusions without quoting their precise and condensed language at such length as would unduly extend this opinion. The defendants' expert concludes that the motor is operated (D, E, p. 78) by "the mutual action between the field set up by the copper band, H," (which incloses one of the pole pieces of the field magnet), "and the field set

up by the current in the armature circuit, F, under that part of the field magnet marked D." On the other hand, the plaintiff's experts conclude that the motor is operated by the progressive shifting of polarity that is the characteristic effect of a Tesla motor, and that such shifting is produced by substantially the same arrangements in the one case as in the other.

As already indicated, I am of opinion that the plaintiff's theory of operation is correct, and I cannot do better than state it in the language of counsel. The defendants' motor is thus described:

Fig. 13.

"The infringing apparatus is an alternating-current motor. Two forms and sizes of this motor, as made by the defendants, are in evidence; but, as the experts for both sides agree that they differ only in structural details, but one form will be considered.

"The motor, in general appearance, is of cylindrical form, with a shaft passing axially through it, and carrying a fan at one end. An inspection of the outside cylindrical portion of the motor proper shows it to consist of laminated magnetic cores composed of bundles of iron plates disposed in a circle parallel to the shaft, and which in the small motor are six in number. The arrangement of these bundles of plates is roughly analogous to that of the staves of a barrel.

"The cores have at each end inwardly extending polar projections, radial with respect to the cylindrical outline which the group as a whole presents. On each of the cores or bundles of plates which constitute elements of this cylinder, and between the polar projections of the same, are wound coils of wire which produce magnetic poles of opposite sign at the polar projections; and the coils of the several elements of the cylinder are so wound and connected that, when joined to the supply circuit, and traversed by a current impulse of given direction, they produce alternately opposite poles in the circumferentially successive polar projections. These coils, when joined up together, constitute the main or primary energizing circuit of the motor, which receives current from an external source.

"Each of the bundles or cores is divided throughout its length into two parts, and the polar projections of the smaller parts are surrounded by conductors in the form of a coil of a single convolution, and composed of flat

copper bands, the ends of which are soldered together, so that each constitutes a short-circuited or closed conducting path around one of the two polar projections into which each of the cores is divided.

"The secondary element or armature of the motor is composed of a circular series of bundles or iron plates, thirteen in number, arranged around the shaft, and parallel thereto. Each of said bundles or cores has polar projections at its ends extending radially outward, and surrounded by closed conductors or coils formed of copper cylinders with longitudinal slots through which the polar projections extend. The copper cylinders resemble in form the rotating portion of a squirrel cage, and this form of winding has long been known as a 'squirrel-cage' winding. The motor is in all respects substantially the same in construction as the fan motors made by the complainant's licensees, and is a slavish copy of a form of motor patented in 1895 by the Westinghouse Company, hereinafter referred to."

## The plaintiff's theory of operation is as follows:

"Assume, therefore, that the motor be connected with the circuit of a generator so that alternating currents flow through all the main or primary coils, A, A, surrounding the field cores. In the absence of any disturbing causes, the polar projections, I and D, would, in consequence, exhibit magnetic phases corresponding to those of the currents producing them; that is to say, the magnetism of each pair of polar projections would simultaneously rise, fall, and reverse, while at any given instant of time the polarities of circumferentially successive pairs of polar projections would be of opposite sign. This would exert no rotative effect upon the armature, whether the latter were provided with closed coils on its polar projections or not; for, as explained above, we should then have the conditions which obtain in the ordinary single-phase synchronous motor, in which the armature must be brought up to a speed corresponding to the rate of alternations of current producing the field, before it can rotate in obedience to the magnetic actions of the field.

"But the armature of the defendants' motor does start from a state of rest, and runs up to full speed even when run by a current of 16,000 alternations per minute, so that there must be present some conditions other than those due to the simple alternation of its poles, and it only remains to determine what those conditions are.

"It is evident that a current which passes from an outside source through any of the coils, A, A, magnetizes both of the cores surrounded by such a coil. In other words, it creates a magnetic field which passes through both of the polar projections of the compound core energized by such a coil; that is, through the polar projection, D, which is not surrounded by the copper band, and through projection, I, which is.

"It is further evident that the passage of the lines of force through the plane of the closed circuit which is afforded by the copper band, H, must result in the development of a current in such band, which will not be in phase with the primary current, but will follow after it, rising from zero to its maximum, and then falling and reversing later than the current in coil, A, by which it is produced.

"But the existence of a current in a closed conductor or coil necessarily implies the creation by such current of a field of force, and, if the coil surround a magnetic core, the magnetization of such core. This is what happens in the present case; but as the current in the copper band, H, is later than that in the wire coil, A, the magnetization which it imparts to the portion of the core, I, which it surrounds, is later in time than that developed by the wire coil.

"The fact that a current is developed in the copper band, H, also implies, and of necessity involves, the transformation of a portion of the energy of the magnetic field produced by the coil, A, into such a current. In other words, a portion of those lines of force which would otherwise pass into the smaller polar projection, I, and be there immediately manifested in its magnetization, are absorbed by the copper band, and converted into current. Hence the initial magnetization of the smaller projection will be weaker than that of the larger projection, in proportion to the number of lines that have been taken up by the copper band, so that not only the maximum, but also the minimum,

magnetizations of the smaller projections, I, will occur at later periods than the corresponding phases of the larger ones, D.

"We have therefore in the defendant's motor a series of pairs of poles, each pair consisting of a large polar projection, D, and a smaller one, I, the periods of magnetization of which do not accord in point of time, for the phases of the smaller projections follow after those of the larger. These are the conditions of a rotating or shifting field, and they are produced by the conjoint action of two alternating currents of different phase, one of which is induced by the other.

"It being incontestably true that, as between any two polar projections of the same compound core, there exists a time difference in the phases of magnetism which they exhibit, it will readily be seen how such conditions result in the rotating or shifting magnetic field of the Tesla patents. For, assume that this time difference were equal to one-quarter of a complete cycle of change, which is the ideal condition of operation. Then, when any given polar projection, D, exhibits maximum magnetism of one polarity, the adjacent projection, I, which is surrounded by the same wire coil, will have practically no magnetism. As the strength of D decreases, that of I increases, until the first becomes nil, and the second reaches its maximum.

"The magnetism of the first then rises from zero to a maximum in an opposite direction, while that of the second or smaller is falling from maximum to zero, but without change of direction. Next the first falls from maximum to zero, while the second rises from zero to maximum, but with the same direction now as the first, and so on.

"Under these conditions it is obvious that the resultant attractive effect of any pair of projections will shift or swing from that pole which is first to reach its maximum towards that which is later; and, having regard to the polarity of this resultant, it will be seen that, after shifting from a larger projection, D, to its smaller companion, I, it then shifts from the latter to the larger projection, D, of the next adjacent pair, and so on through the whole series around the armature, in exactly the same manner as takes place in any Tesla motor having more than two single or double poles.

"To explain this further: When the resultant, which is, say, of north polarity, has shifted from a larger to a smaller projection, the latter is maximum north, and the former is zero, and just about to change; but the larger projection, D, of the pair next adjacent on the side of the smaller projection, I, now at its maximum, is also zero, and just about to change. Its change, however, will be from south to north, or to the same polarity as that exhibited by the smaller projection, I, of the first pair; hence the north resultant will continue to shift from the said smaller projection, I, over to the larger projection, D, of the adjacent pair, while a south resultant will at the same time shift from the larger to the smaller projection of the first pair.

"Each pair of projections may be regarded as constituting an independent couple, all of which, however, co-operate; one couple taking up and carrying on the resultants that have shifted between the members of the couple preceding it. This is, of course, true of all Tesla motors having more than one couple, as in practice is nearly always the case. And it is also true in cases where the difference in phase between the currents, or the magnetizations resulting therefrom, is not exactly a quarter of a cycle, but something less or more. As explained above, and as stated by Tesla in the patents in suit, the ideal difference in phase of 90 degrees can only be obtained by the employment of independent sources of current; but sufficient difference of phase for all practical purposes is secured artificially in the Tesla 'split-phase' motors and in that of the defendants, and the general law of operation is the same in all cases.

"The shifting or rotating field in the defendants' motor has precisely the same effect on the armature with closed coils as would result from moving bodily around the armature one or more permanent magnets, as we have explained in a previous portion of this brief."

I think, therefore, that this defense must fail, and that the defendants' motor infringes all the disputed claims of the patents in suit.

The last defense avers that the plaintiff has assigned all its interest in the patents in suit to the Westinghouse Electric Company by an agreement executed July 7, 1888, and therefore that the present action cannot be maintained, because the Westinghouse Company has not been joined as a party complainant. This defense was not taken by the pleadings, as it should have been in order to bring it properly before the court, and under the circumstances I am not disposed to give it any weight. Assuming the agreement of July 7th to have the effect contended for, the only result of dismissing the bill would be to renew the controversy in another proceeding, where the same evidence would be heard, and the same conclusion would be reached. The failure to make the Westinghouse Company a party plaintiff, if such a joinder was necessary, is a formal defect, that has no bearing, so far as has been made to appear, upon the substance of the controversy. But I think it would be reasonable to protect the defendants from the possibility of being called upon to answer that company for the same cause of action, and I understand the plaintiff to agree that the court should take that course. If, therefore, within 20 days from the date of filing this opinion, the plaintiff shall file with the clerk a stipulation, executed by the Westinghouse Electric Company, agreeing to be bound by the decree in all respects as if it had been originally a party plaintiff, the decree prayed for by the bill will be entered.

### Motions to Amend Answer and for Rehearing.
#### (December 1, 1899.)

I have considered these motions, but without being able to conclude that either should be allowed. I am still of opinion that the defense of want of proper parties was not taken in time, and I think, also, that the motion to amend—which was not presented to the court until after the decision of the case had been announced, and the form of the final decree was under consideration—has been unduly delayed; but the court, of its own motion, has given the defendants a protection to which, in strictness, they were not entitled, and I confess to some surprise at finding them apparently aggrieved.

The remaining ground upon which a rehearing is asked is the supposed failure of the court to consider the defendants' argument upon the subject of comparative structure. The supposition finds some support in the silence of the opinion upon this point, but the failure is in appearance only. I considered the argument, and did not extend the opinion by discussing it at length, because I regarded it as answered, in effect, by the decision upon the subject of comparative method of operation. It seemed to me that the testimony showed the two subjects to be so closely connected, in this particular case, that, if the method of operating both forms of motors was found to be the same, the structures must at least be equivalent, if not substantially the same. The point was considered, therefore, and decided, although it is not expressly referred to.

Both motions are accordingly denied.