### WESTINGHOUSE ELECTRIC & MFG. CO. v. CATSKILL ILLUMINATING & POWER CO.

(Circuit Court, S. D. New York. August 22, 1901.)

PATENTS—INFRINGEMENT—ELECTRIC MOTORS.
The Tesla patents, No. 511,559 and No. 511,560, relating to the method and apparatus for electrical transmission of power by means of what are known as "split-phase motors," *held* not anticipated and valid. Claims 1 and 2 of No. 511,559 and claim 1 of No. 511,560 also *held* infringed.

In Equity. Suit for infringement of patents. On final hearing. See 94 Fed. 868.

This cause was heard upon pleadings and proofs. It is a suit for alleged infringement of two United States letters patent to Nikola Tesla, viz. Nos. 511,559 and 511,560, both issued December 26, 1893, on application filed December 8, 1888.

Kerr, Page & Cooper, for complainant.
Seward Davis and Charles A. Brown, for defendant.

LACOMBE, Circuit Judge. Patent No. 511,559 is for "electrical transmission of power." The specification begins:

"In certain patents heretofore granted I have shown and described a system of electrical power transmission, in which each motor contained two

or more independent energizing circuits, through which were caused to pass alternating currents having in each circuit such a difference of phase that, by their combined or resultant action, they produced a rotary progression of the poles or points of maximum magnetic effect of the motor, and thereby maintained the rotation of its movable element. In the system referred to and described in said patents, the production or generation of the alternating currents, upon the combined or resultant action of which the operation of the system depends, is effected by the employment of an alternating current generator with independent induced circuits, which, by reason of the winding or other construction of the generator, produced currents differing in phase, and these currents were conveyed directly from the generator to the corresponding motor coils by independent lines or circuits. I have, however, discovered another method of operating these motors, which dispenses with one of the line circuits, and enables me to run the motor by means of alternating currents from a single original source. Broadly stated, this invention consists in passing alternating currents, obtained from one original source, through both of the energizing circuits of the motor, and retarding the phases of current in one circuit to a greater or less extent than in the other. The distribution of current between the two motor circuits may be effected by induction or by derivation. In other words, I may pass the alternating current from the source through one energizing circuit, and induce by such current a second current in the other energizing circuit; or, on the other hand, I may connect up the two energizing circuits of the motor in derivation or multiple arc with the main circuit from the source. In either event, I make due provision for maintaining a difference of phase between the currents in the two circuits or branches. In carrying out my invention I have used various means for securing the result. For example, when I induce a current in one of the circuits from the current flowing in the other, I employ a form of converter, or bring the two circuits into such inductive relations as will produce the necessary difference of phase; or, when I obtain the two energizing currents by derivation, I make the two circuits of different degrees of self-induction by inserting a resistance or self-induction coil in one of said circuits, or I combine these devices in different ways, as I shall more specifically describe hereafter."

After a description of the drawings, the specification concludes:

"In an application filed of even date herewith, I have shown and described other ways of accomplishing this result, among which may be noted the introduction of a resistance capable of variation in each motor circuit, or the use of a resistance, in one circuit and a self-induction coil in the other. In the above description I have referred mainly to motors with two energizing circuits, but it is evident that the invention applies equally to those in which there are more than two of such circuits, the adaptation of the same being a matter well understood by those skilled in the art. I do not claim in this application the specific devices employed by me in carrying out the invention; have made these the subjects of other applications."

The only claims of the patent are:

"(1) The method of operating motors having independent energizing circuits, as herein set forth, which consists in passing alternating currents through both of the said circuits, and retarding the phases of the current in one circuit to a greater or less extent than in the other. (2) The method of operating motors having independent energizing circuits, as herein set forth, which consists in directing an alternating current from a single source through both circuits of the motor, and varying or modifying the relative resistance or self-induction of the motor circuits, and thereby producing in the currents differences of phase, as set forth."

Patent No. 511,560 is for apparatus for carrying out the "derivation method" of the second claim of 511,559. It shows different arrangements of resistance or self-induction devices, or both, in the de-

rived circuits, for the purpose of securing the requisite difference of phase. The specification says:

"In explanation of what appears to be the principle of the operation of my invention, and of the functions of the several instrumentalities comprised thereby, let it be assumed that the two energizing circuits of an alternating current motor, such, for example, as I have described in my patent No. 382,-280, dated May 1, 1888, are connected up in derivation or multiple arc with the conductors of a circuit including an alternating current generator. It is obvious that if both circuits are alike, and offer the same resistance to the passage of the current, no rotary effect will be produced; for, although the period of the currents in both circuits will lag or be retarded to a certain extent with respect to an unretarded current from the main circuit, their phases will coincide. If, however, the coils of one circuit have a greater number of convolutions around the cores, or a self-induction coil be included in one of the circuits, the phases of the current in that circuit are retarded by the increased self-induction. The degree of retardation may readily be secured by these means which will produce the difference in electrical phase between the two currents necessary for the practical operation of the motor. If, in lieu of increasing the self-induction of one circuit, a dead resistance be inserted, the self-induction of such circuit exerts a correspondingly diminished effect, and the phases of the current flowing in that branch are brought more nearly in unison with those of an unretarded current from the main line, and the necessary difference of phase between the currents in the two energizing circuits thus secured. I take advantage of these results in several ways. For example, I may insert variable resistances in both branches or energizing circuits, and, by varying one or the other so as to bring the phases of the two currents more or less in unison with those of the unretarded current, I may thus vary the direction of the rotation of the motor. In lieu of resistances I may employ variable self-induction coils in both circuits, or I may use a resistance in one and a self-induction coil in the other and vary either or both. This system or means of operating the motors is rendered of great practical value by employing an armature wound with energizing coils closed upon themselves, in which currents are induced by the alternating currents passing in the field coils that serve to greatly increase the mutual attractive effect between the armature and the field magnets. This use of the armature with closed coils I regard as an important feature of my invention. * * *"

After describing various arrangements with reference to the drawings, the specification proceeds:

"Similar results may be secured by such a construction or organization of the motor as will yield the necessary differences of phase. For example, one set of energizing coils may be of finer wire than the other, or have a greater number of convolutions, or each circuit may contain the same number of convolutions, but composed of different conductors; as, for instance, one of copper, the other of German silver. I have represented this in Fig. 6, in which the coils C are indicated by closer lines than coils D."

The two claims (out of seven) which are in controversy here are:

"(1) The combination with a source of alternating currents, and a circuit from the same, of a motor having independent energizing circuits connected with the said circuit, and means for rendering the magnetic effects due to said energizing circuits of different phase, and an armature within the influence of said energizing circuits. (2) The combination with a source of alternating currents and a circuit from the same of a motor having independent energizing circuits connected in derivation or multiple arc with the said circuit, the motor or energizing circuits being of different electrical characters, whereby the alternating currents therein will have a difference of phase, as set forth."

These patents belong to what is known as the "split-phase" system of producing motor action. From the quotations above given it will be apparent that claim 1 of No. 511,559 covers broadly both the methods of splitting phases suggested, viz. by induction and by derivation. Claim 2 of No. 511,559 covers only the method suggested by derivation, with modification of relative resistance or self-induction of the motor circuits. Claim 1 of No. 511,560 covers apparatus for carrying out the derivation method broadly by "means for rendering the magnetic effects due to the energizing circuits," which are connected with the circuit of supply, of different phase. Claim 2 of No. 511,560 is restricted to apparatus in which the energizing circuits are "connected in derivation or multiple arc with the [supply] circuit." Another patent, No. 555,190, covered apparatus for the induction method.

The testimony is voluminous, many of the questions discussed are highly abstruse, involving a degree of technical knowledge which only years of study and training could impart, and which it is not possible for a court thoroughly to absorb, no matter how able the briefs and argument, within the utmost time that can possibly be given to the study of the record. Fortunately, however, many of these questions are, so far as this court is concerned, already decided, and to that extent they need not be discussed or presented here.

Tesla, on May 1, 1888, took out patents for a system whereby alternating currents differing in phase were brought to, and passed through, independent energizing circuits in a motor, with the result that a whirling field of force was produced, which caused the armature of the motor to revolve. This is what is known as the "polyphase system," and a large part of the testimony in this case is directed to the question whether Tesla was its inventor. That issue, with all its collateral questions, was before this court in a suit upon the fundamental patents covering that system (Nos. 381,968, 382,280, and 382,279), in which suit it was held that Tesla was a highly meritorious inventor, and was entitled to the broad claims which covered the polyphase system. That decision has been sustained in the circuit court of appeals, and reference may be had to the opinions of both courts for an elaborate discussion of that branch of the art. Westinghouse Electric & Mfg. Co. v. New England Granite Co. (C. C.) 103 Fed. 951.

One of the defenses set up is that the inventions are covered by other patents to the same inventor (Nos. 421,193 and 445,207). Inasmuch as a similar defense (as to No. 421,193) was interposed in

Westinghouse Electric & Mfg. Co. v. Dayton Fan & Motor Co., 106 Fed. 724, a suit decided in the Southern district of Ohio, February 6, 1901, and overruled, it was not pressed in argument here.

Another defense is that No. 511,559 is invalid for the reason that it is for a function of the machines of No. 511,560. That was disposed of on demurrer adversely to defendant, and, of course, was not re-argued here.

Question is raised as to the date of invention. The application was filed December 8, 1888, but the patentee undertook to show a disclosure of the invention to others prior to April 22, 1888. The same question upon the same evidence was decided in Tesla's favor in the Dayton Fan & Motor Case. It is suggested in supplemental brief that it was not argued in that case. An independent examination of the testimony leads to the same conclusion. The two witnesses are men of education, special training, and character. Their evidence is clear, direct, and specific. It is not weakened by cross-examination. Indeed, they were hardly cross-examined at all. Moreover, there were circumstances which were well calculated to fasten the disclosure in the mind at least of one of them; for it awakened doubts as to the advisability of letting the polyphase patents go through the patent office without some modification, and finally the dates of application for those patents and entries of charge in the register of one of the witnesses fix the date otherwise than by mere recollection. The evidence is highly persuasive, and the same conclusion is reached as in the Dayton Case.

In an action in the Eastern district of Pennsylvania (Electric Co. v. Scott [C. C.] 97 Fed. 588), two other patents to Tesla were involved, one of which (No. 511,915) covers the mode of obtaining difference of phase by induction, as the second claim of No. 511,559 covered the other mode by derivation. The first claim of No. 511,559, as was said before, is the generic claim which covers both modes. It is apparent, therefore, that in that suit questions as to novelty and patentability of the broad claim, as to the state of the art and the measure of invention displayed, were necessarily presented.

In the Dayton Fan & Motor Co. Case and in the Scott Case the courts both held that the patents were not anticipated, and that the question of invention should be resolved in favor of the patents. It is not understood that the present record discloses any alleged anticipations or any earlier patents or publications which were not in one or other or both of these suits, and their conclusions on that branch of the case will be followed here. This reduces the case to a question of infringement.

The defendant's device is an alternating current Watt motor meter, in which there is a rotating disk which is put in motion by currents flowing through coils so arranged relatively to the disk as to produce such rotation. The testimony on this branch of the case is voluminous and highly technical, and in parts extremely difficult of comprehension by any one save an experienced electrician. It would be idle to undertake to discuss it at length. The Scheefer meter is indicated in defendant's brief by the following diagram:

A, A, are coils of fine wire; B, a coil of coarse wire; C, a square iron core; D, the rotating disk. Whatever this diagram may or may not show, it is contended by complainant that current from the circuit to which the meter is connected divides so that part passes through A, A, and part through B; and that is not denied. It seems to be well settled that, for reasons which it is not necessary to detail, currents traversing such a circuit as B are not retarded to the same extent as are those traversing such a circuit as A, A. The natural consequence would seem to be that there would be a difference in phase between such currents, and that there would result the shifting or progression from pole to pole of the magnetic resultant which Tesla described in his polyphase patents. It would be expected that such shifting would rotate the disk. When current is passed through the Scheefer meter the disk rotates. If this were all, it would seem that infringement is made out.

Defendant, however, contends that infringement is not shown for several reasons:

(1) That the patents cover motors only, and the Scheefer device is a meter. This is a mere verbal distinction without apparent merit. The patents do contemplate the production of power, but they are wholly silent as to the amount of power. The Scheefer meter exerts power, its disk rotates against the action of a permanent magnet, and turns the spindle which operates the registering devices.

(2) That apparatus, to be within the patents, must operate by the so-called "Tesla rotating field,"—the "whirling field of force" of the polyphase patents, produced by a difference in phase of the currents in the energizing circuits. That proposition is undoubtedly correct. Defendant further contends that the Scheefer meter does not so operate, and therefore that it does not infringe. Between the elaborate theories of the opposed experts as to the mode of operation of this meter it might be difficult to choose. It is thought that the practical tests do not sustain this last proposition. One of defendant's witnesses experimented with a meter having both currents in the same phase, but the meter he used was not the meter complained of. He made changes in some of the coils before he experimented. It is true that complainant's experts admit that there will be a movement of the disk with reduced speed when currents are in phase, but this admission is qualified by the further statement that "the Scheefer meter, as actually constructed and operated, has a very great differ-

ence of phase between its currents, and this fact is the chief operative cause in the meter. The addition of 15 degrees phase difference between the fields adds slightly to the rotative effort, and increases the accuracy of the meter." Upon this branch of the case the conclusion arrived at is that expressed by one of complainant's experts:

"The Scheefer meter works normally with a difference of phase between the currents. The increased difference of phase between the fields is a refinement which may be overlooked entirely in determining the question of the presence of the inventions of these patents. Without the difference of phase between the currents, the Scheefer meter would not be a Watt meter, and would not be sufficiently powerful or sensitive to be a meter of any kind. The effective cause of the operation is therefore the difference of phase of the currents."

Various other conflicting theories as to why and how the revoluble part of the meter revolves need not be enlarged on. The preponderance of evidence indicates that in the Scheefer meter, as sketched above, there are independent energizing circuits; that alternating current from a supply circuit is passed through both; and that by variation or modification of the relative resistance or self-induction of these energizing circuits they are put into different phase, and that the revoluble disk becomes effectively operative because such arrangement exerts its influence through the development of the whirling field of force which is characteristic of the Tesla method. In consequence there is shown infringement of both claims of No. 511,559 and of the first claim of No. 511,560. As was said before, the second claim of No. 511,560 is restricted to apparatus in which the energizing circuits are connected in derivation or multiple arc with the supply circuit. There seems to be some conflict in the proof as to how the Scheefer meter is arranged relatively to the supply circuit, and complainant's witnesses are not entirely in accord. There is not such a preponderance of evidence that both energizing circuits are connected in multiple arc with the supply circuit, and infringement is therefore not made out. Decree accordingly.