ARCHBAED, District Judge.*
The idea of a weakened head or part to relieve from the strain of excessive interior pressure in an inclosed chamber was not new with Nash, but he was the first to apply it to water meters to obviate the danger in case of freezing. To this extent he was clearly a pioneer, for, while others have followed after, there was none in the meter art, so far as disclosed, before-him;- and, as one who has solved a serious practical problem, he is entitled to the fruits of his inventive skill, unless it was so plainly anticipated in analogous arts that this cannot be accorded him. The expanding power of water in freezing is substantially irresistible, and it operates in its own special and peculiar way. It is not a fluid pressure, so as to have the strain transmitted from one point to another, but it is a pressure exerted as the water turns to a solid, losing its previous mobility. If freezing occurs, therefore, in a meter chamber, something by predetermined arrangement must be prepared to give way, or the meter case will be burst in two, and the meter ruined. This is provided for in the patent in suit by weakening relatively .the head of the meter chamber, against which the force of the expanding ice is enabled to expend itself without serious damage to the other parts. The invention is thus described in the specifications:
“Another important feature,” says the inventor, “is a provision by which the meter is prevented from being damaged^ by freezing. For this purpose I form the upper head of the case so that it shall be very much weaker in • thickness at some point, as at u, u, than the body of the case; it being, however, made amply strong to sustain the ordinary pressure of the water to which it will be subjected in actual use, but not strong enough to sustain the pressure due to the freezing in the case. The body of the case is, however, made very strong, so that when the water freezes in the meter the case will not be injured, but the upper head will yield with the pressure of the ice, and thus prevent all excessive strain upon the case. In order to accomplish this without danger of the case-head changing its form under the water-pressure, and from other causes, I prefer to make the head of sufficient thickness, and then to form a groove, u, around that portion of the *77 head which it is desired to have yield to the freezing-pressure. In this way I form a case-head which will keep its shape under all ordinary conditions of pressure, hut which will yield readily to excessive pressure before the case is in danger of being destroyed. The same effect can be accomplished by making the upper head of uniform thinness; but, for the reasons given, I prefer to form it of unequal thickness.”
These ideas are embodied in the two following claims:
“(14) The combination, with a water meter having its chamber-forming case made relatively strong, of an inclosing-head therefor made relatively weak, whereby to form a yielding part against undue interior pressure.
“(15) The cover or inclosing-head of a water-meter case having a groove or surface-recess to reduce the thickness of the inclosing-head over the measuring-chamber, substantially as described, and for the purpose stated.”
The first of these claims is in very broad terms, and covers every case where the inclosing-head is made relatively weak, by whatever device effected, and comes very near in this to an attempt to claim a result or idea, rather than the structural means by which it is produced or carried out, which is alone patentable. Neither is there any reference back to the specifications by the usual formula, “substantially as described,” or “for the purpose designated”; thus laying ground for the contention that it is not limited to providing against strain from freezing, only, but from undue interior pressure of every character as well. The same is also urged with respect to the fifteenth claim, where the reference appears, but is equally unavailing as to both. The manifest purpose of endeavoring to broaden their scope in this way, so as to make them apply to all cases of excessive interior fluid pressure, such as water hammer or abnormal hydrostatic head, is to enlarge the art to which they are to be assigned, and so the easier to demolish them. But it is useless, as it seems to me, to argue that either claim can be so separated from the connection in which it is found or extended to embrace a function not there specified. It is, no doubt, true that an element not stated in a claim cannot be brought forward from the specifications and imported into it. McCarty v. Railway, 160 U. S. 110, 16 Sup. Ct. 240, 40 L. Ed. 358. But that is by no means to say that the specifications which precede do not limit it, or that they are not to be resorted to, as they always freely are, to explain it and give it character. The inventor in the present instance does not, and, in my judgment, could not, claim what is thus sought to be thrust upon him. He was not seeking, in this feature of his invention, to provide against anything else than ice pressure; and while it may be desirable, in a water meter, to have a yielding part that will go down under the stress of other undue internal forces (although this is controverted), he must abide by what he has described and claimed. I do not know that it makes any serious difference whether the scope of the patent be enlarged in the way that is so contended for, but it is just as well to keep it within its proper limits, and we are more likely to arrive at a correct conclusion if we do. The old suggestion comes as a warning: “Timeo Dañaos et dona ferentes.”
It may.be as well, also, in this connection, to dispose of the proposition advanced by the defendants, that a water meter is nothing more than a water motor; reference being made to the Davies (Scotch) *78 patent to show that they are interchangeable. In structure and general mode of operation this may be true, but for the purposes of this case it is not. A meter, however actuated, is not designed for exerting or transmitting power, but simply for measuring and registering fluid volume; and, as a matter of applied art, the two are essentially different. The manifest object of this contention, the same as the other, is to draw the case within the circle of the motor or power references relied upon, or at least to establish a close analogy with that art. In the view I take of it, however, this is not very material. But at the same time, as I said before, it is well to preserve the distinctions, and that they exist I am fully persuaded.
This- brings us to the question of the alleged anticipations. Of the references cited, the Larmuth (English, 1867) is s0 ^ar afield that I will not stop to discuss it. The Stone Provisional (1861) is an apparatus to prevent water pipes from bursting by the action of frost, and consists in providing the upper end of a communicating pipe with an elastic cover, which, while sufficient to resist the ordinary pressure of the water head, will give way, as supposed, when the pipe is subjected to the expanding power of the freezing water. But it is founded on a physical misconception, and is absolutely worthless for the purpose suggested; and the patentee evidently so decided, for he never, apparently, followed it up. The difficulty is that, the moment an ice plug forms, the means of transmitting and relieving the attendant pressure through the water behind it is cut off. If it were otherwise, the pipes, as now arranged, w.ould be sufficient to do so through the water back of the ice plug, the pressure of which is never great enough to stand in the way. For the same reason, a pitcher, jug, or bottle will burst in certain cases if the water in it freezes, notwithstanding the apparent vent provided by an open mouth. Counsel for defendants virtually concede that this reference is of little value, for all that is claimed for it in their brief is that it embodies the underlying idea of the present patent, in providing something which will yield to internal pressure exerted by water in the act of freezing. But to stand as an anticipation it must disclose, not a vague idea, which some one, perchance, can work out and make effective—much less, a useless and impracticable conception— but an operative device, having substantially the same features, employed for the same or a substantially analogous purpose, and that the patent cited plainly does not do. The Smith (1865) is a steam safety valve, pure and simple, although of a special and somewhat novel construction; being provided with a disc of thin metal to be broken down in case the valve itself should fail to work. Except that it has a predetermined weakened part, to yield in the emergency suggested, it has nothing in common with the case before us. The same is true of the Mann (1861) and the Baker (1887), the latter of which is a safety vent for steam boilers, particularly designed for use in railway cars. It consists of a bulb-shaped head screwed onto the top of a tube connecting with the boiler, and weakened on the under side of its upper surface, which breaks under excessive interior pressure. The Tabor (1884) safety head for steam engine cylinders also makes use of the same idea. The danger there sought to be obviated *79 is the accumulation of an excess of water in the cylinder, and it is met by relatively weakening the head, which is arranged to give way, and thereby relieve the strain. The two Tracys (1884 and 1885) are of similar construction. Both are safety devices for hot water boilers by means of a weakened cap or head inserted at one end, and are supposed to approach more nearly than any to the patent in suit, because they claim to meet the danger from freezing, also. In the earlier of the two the cap is retained by bolts designedly made weak, and in the other it is weakened by an annular groove or depression on its under surface, the same as in the patent in suit. Notwithstanding these resemblances, both general and particular, all the safety appliances mentioned must be assigned, in my judgment, to another art. They are nothing more than an extension of the principle found in the ordinary steam safety valve or gauge, which might just as well have been relied upon as an anticipation as any of these. The conditions to be met in the case of excessive fluid pressure, such as that from water or steam, and that caused by the expanding power of ice at the moment of freezing, are by no means the same. This is due to the fact, already alluded to, that water, in freezing, loses its mobility, and exerts its force, not as a fluid, but as a solid; and while it is true that, so far as opportunity is given, the force exerted will in ordinary cases be transmitted back through the water which remains uncongealed,' seeking a vent, if there is any to be reached, yet this can only take place to a very limited extent, if at all, in the confined space of a meter chamber, where the whole body of water may go solid, or the ice so form, as to create an inclosing or obstructing cap. The problem presented is not the same, therefore, as where a simple fluid is to be dealt with; and, even though the same general principle of a predetermined weakened part be employed, its adaptation to new and different conditions is something more than a mere transfer of an old device to an analogous art. As was said in Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275:
“It often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic of great inventors, to grasp the idea that a device used in one art may be made available in another, as would be necessary to create the device de novo.”
And that, in my judgment, may well be said of what we have here. The truth is that the patent in suit consists not alone in the use of a weakened part, but in so placing it that it will be in immediate, or at least uninterrupted, contact with the force exerted by the congealing water, and thereby competent to take the strain in relief of the other parts. This is effected by locating it at the head of the meter chamber. The specifications recognize that the whole head may be made of uniform weakness, and claim 14 also countenances the same idea, if it does not expressly adopt it. The inventor seems to have preferred a partial weakening, by means of a groove or surface recess; but the significant thing, whichever form be adopted, is that it- is not a remote part which is weakened, but that which is immediately “over the measuring chamber.” It was conceded, by Mr. Wetmore at the *80 argument that the weakened groove or rim, where that is the particular structure relied upon, must be in such position with reference to the meter chamber that there shall be no projection or shoulder, across which the ice can form, and thereby obtain a rupturing purchase, or, in other words, that one entire wall must go out. This is not declared for in so many words in the patent, but can be readily spelled out of it. It is clearly portrayed in the first figure of the accompanying drawings, and sufficiently indicated in the provisions of both the specifications and claims. By claim 15, as it will be noted, the groove or surface recess is to be over the measuring chamber, which must mean effectively over it; and in claim 14 the head is ‘ weakened as a whole, and not in part, in accordance with the alternative recognized in the preceding specifications. This feature, of itself, if nothing else, is sufficient to distinguish the patent in suit from those which have been cited against it. It constitutes, in fact, the necessary adaptation of the common principle of a yielding part found in all of them, but employed under different conditions from what are found here. In the Tracys, for instance, while we find a weakened head, the declared purpose of which, the same as here, is to relieve from undue internal pressure, including that from ice in case of freezing, yet there is no assurance, if this should happen, that the ice would accommodate itself to the arrangement provided for it, nor could it be controlled or made to. Leading up to the weakened cap is a distinct neck, like that of a bottle; and if, as pointed out by Dr. Morton, the freezing should extend to this part of the boiler, a plug or bridge of ice would be likely to form across it, that would cut off and protect the weakened cap, and thus entirely destroy its effectiveness. It would be impossible, therefore, to apply to a meter chamber this device, without such adaptive changes as would virtually transform it into a new invention; and the same is true of the other safety devices which have been brought forward. They, one and all, would be absolutely ineffective, as they stand, for any such purpose as that which is covered by the present patent, and cannot, therefore, be regarded as anticipations of it.
There is a word to be said with regard to the fourteenth claim before passing on to the question of infringement. As to several of the defendants’ meters, it is the only claim on which infringement can be predicated, and it is therefore important to determine its scope and character. As intimated above, and as was the case in the eighth claim of the Morse patent (O’Reilly v. Morse, 15 How. 62, 14 L. Ed. 601), it comes very close to the attempt to patent a mere result or principle, and I was almost convinced of this at the argument. Further consideration, however, has persuaded me otherwise. The inventor has not stopped with the idea of an indefinite yielding part, but has put that idea into concrete form, adopting as the specific means for carrying it out the combination of a relatively strong chamber-forming case with a relatively weak inclosing-head, in which, as a necessary and important incident, the yielding part, as pointed out above, is brought in immediate contact with the force to be provided against. This is considerably more than a result. It is a particular structural method of producing it, and that is clearly patentable. *81 It is, indeed, the one found to be essential by those who have followed after.
With the fourteenth claim so disposed of, the question of infringement is free from difficulty. It entitles the patentee to successfully charge that, wherever a relatively weakened head is found, his patent is violated; and, as this appears in each of the defendants’ meters in evidence, they all offend against it. We do not need to consider, therefore, whether the style of meter which has a screw bottom, with interrupted and weakened threads, is to be regarded as falling within the fifteenth claim, which calls for a groove or surface recess. It certainly has a head weakened relatively to the chamber-forming case, within the fourteenth claim, and therefore impinges upon it. The same is true of the style in which the bottom is held in place by means of weakened lugs or flanges, designed to break upon undue pressure from within, as well as of those provided with resilient springs, which yield, but do not break; the bottom being forced back into its natural position upon the melting of the ice which crowded it out. In each of these, not only is the idea of a yielding part adopted, but the very structure of a relatively weakened head described and claimed by the patent in suit. It may be that they constitute an advance and improvement, so as to warrant the later patents which have been taken out for their protection; but they must nevertheless pay tribute to the one which went before, inventing the original design, which they have unfortunately found occasion to follow. I have not lost sight of the defendants’ contention that, owing to the special interior structure of their meters, the yielding bottoms cannot be claimed as inclosing-heads of a chamber-forming case. Adhering to the literal terms of the patent, this may be true. Neither, as you might say, are the resilient springs by which in some the bottoms are held in place a part of them; nor, as was hinted at the argument, are the bottoms heads. But under the rule of equivalency these attempted distinctions disappear. Clearly, the outer inclosing shell of the meter in which the weakened and yielding bottom is inserted is a chamber-forming case, within the fourteenth claim, even though a special meter or measuring chamber, also provided to yield, be found within it. It no less incloses and forms a chamber because the interior is still further subdivided into others. The material thing in the patent is that a part of the outer case, against which the pressure of the ice immediately acts, shall yield, to save the rest of the meter. This the defendants have substantially appropriated, however much they may have modified it.
L,et a decree be drawn, in the usual form, sustaining the claims of the patent and directing an accounting.

Specially assigned.

 1. See Patents, vol. 38, Cent. Dig. § 243.