WESTINGHOUSE ELECTRIC & MFG. CO. v. ROBERTS et al.

(Circuit Court, E. D. Pennsylvania. September 10, 1903.)

No. 47.

**1. PATENTS—SUIT FOR INFRINGEMENT—EVIDENCE.**
A patentee is not entitled to use a decision of the patent office in inter-ference proceedings in his favor, nor the evidence on which it was based, as evidence in a subsequent suit for infringement of his patent, against a defendant who had no relation to such interference proceedings.

**2. SAME—PRIORITY OF INVENTION—DISCLOSURE.**
Where an inventor communicates his ideas to one who is thoroughly competent to understand and perpetuate them in case of his death, hav-ing effectively given his invention to the world in this way, he is en-titled to bring forward the disclosure to maintain the asserted priority of his invention.

**3. SAME—PRIORITY—BURDEN OF PROOF.**
While the burden of showing priority is no doubt upon the inventor, and the courts are called upon to scrutinize the evidence closely, they are not required to go out of the way to discredit it, coming from a reliable source.

**4. SAME—DATE OF INVENTION—INFRINGEMENT—ELECTRICAL MOTORS.**
The invention embodied in the Tesla patents, Nos. 511,559 and 511,560, issued December 26, 1893, on applications filed December 8, 1888, the former covering a certain method, and the latter certain means of operat-ing electric motors by a divided and dephased alternating current, de-rived from a single source, being an adaptation of what is known as the "split phase system," *held,* under the evidence, to have been made prior to April 22, 1888, the date of the publication in an Italian electrical journal published at Milan of a report of a lecture by Prof. Galileo Ferraris describing the same system, and therefore not anticipated by such pub-lication. Said patents were not anticipated, and are valid, and entitled to a liberal application of the doctrine of equivalents. Claims 1 and 2 of each patent also *held* infringed.

**5. SAME—INFRINGEMENT.**
A patent for an electrical motor may be infringed by an electrical meter where it is the same in mechanical construction and principle of operation, being no more than an adapted motor with meter attachment.

In Equity. Suit for infringement of letters patent Nos. 511,559 and 511,560, for electrical transmission of power and an electrical motor, granted to Nikola Tesla, December 26, 1893. On final hearing.

Kerr, Page & Cooper, for complainant.

Fred. J. Knaus, Seward Davis, and Charles A. Brown, for respond-ents.

ARCHBALD, District Judge.* The patents in suit and those on which they are based, or which are kindred to them, have been so fully considered in previous cases, which until recently have also been uni-formly in their favor, that little that is new is left to be brought for-ward with regard to them. In an admirable opinion by Townsend, J., in Westinghouse Electric & Mfg. Company v. New England Granite Company (C. C.) 103 Fed. 951, the fundamental patents were reviewed and expounded, and the right of the patentee to stand as an inventor of great merit in the use of alternating electric currents for the trans-

* Specially assigned.

mission of power was fully established. The alleged disclosures of Siemens (1878), Baily (1879), Deprez (1880–84), and Bradley (1887) were discussed, and the claims advanced for them as anticipations held to be unfounded—conclusions which were affirmed on appeal. 110 Fed. 753, 49 C. C. A. 151. The essence of the invention was declared by Judge Townsend to be "the production of a continuously rotating or whirling field of magnetic forces for power purposes by generating two or more displaced or differing phases of the alternating current, transmitting such phases, with their independence preserved, to the motor, and utilizing the displaced phases as such" therein.

The same patents came up before Brown, J., in Westinghouse Electric & Mfg. Company v. The Royal Weaving Company (C. C.) 115 Fed. 733, and a similar result was reached. The Dumesnil (1884) and the Cabanellas (1885), two French patents, which had not been brought forward before, were particularly relied on as anticipations, but were distinguished from those in suit in a carefully expressed and convincing opinion. These French patents, however, according to Judge Brown, established that Tesla was not the first to employ alternating currents out of phase with each other for power purposes, so that the expressions in previous cases which attributed this to him would have, as he thought, to be qualified, if not recalled. But it was at the same time pointed out that in neither the Dumesnil nor the Cabanellas was there a resultant magnetic force, the distinctive feature of the Tesla invention, each of the others named providing for the independent action of separate alternating currents operating on different ends of the motor armature, without any play of the magnetic and electric forces in between. As it stands, the Cabanellas patent is unintelligible to me; but taking it as it is explained by the defendants' experts and illustrated by the exhibit in evidence, of the correctness of which, however, I have much doubt, there is nothing more, at the best, than a mechanical combination of the two operative devices, like the opposite cranks on the same axle of a locomotive driving wheel. There is no conjoint operation, as in a Tesla motor, of the two energizing circuits by means of a combined magnetic influence to produce a common result. It is important, however, to observe that, while in no sense anticipations, the Dumesnil and the Cabanellas serve to limit the invention of Tesla—if not, indeed, so limited in his patents themselves—to a device in which a magnetic resultant of dephased alternating currents exists; the mere use of alternating currents out of phase with each other, made otherwise effective, being something aside and different.

The derivative patents in suit—Nos. 511,559 and 511,560—were first considered in the Dayton Fan & Motor Case (C. C.) 106 Fed. 724, affirmed in 118 Fed. 562, 55 C. C. A. 390, and a decision rendered in substantial accord with those which had preceded it. One defense there, as here, attempted to be made was that it involved no inventive skill, when once the practicable use of alternating currents of different phase was established, to substitute a dephased split current, which was a well-recognized equivalent. But it was not so held, nor can it be here. This question was practically put at rest in this court by the decision of Judge McPherson in the Tesla Electric Co.

v. Scott & Janney (C. C.) 97 Fed. 588, where two of the earliest Tesla split phase patents were sustained. But aside from that, and upon an entirely independent consideration of it, the same conclusion must be reached.

A serious doubt as to the economic value of the polyphase Tesla motor was that it required independently generated currents, and, as so limited, lacked commercial adaptability, the alternating current in ordinary use, such as that on electric light wires, being single. According to Mr. Brown, who was asked to become interested, he raised this question at once; and it was the criticism made of it by Swinburne in the Electrician of July 20, 1888, and by Richard in La Lumière Electrique, of January 19, 1889. Tesla, if he is to be believed, immediately addressed himself to this problem, and it is successfully solved in the patents in suit and others applied for about the same time. It does not detract from the inventive skill involved that he appropriated the experiments of Oberbeck with regard to the splitting and dephasing of alternating currents derived from a single source, nor yet that others took up the subject independently and worked out similar ideas. All who are thus brought forward—Ferraris, Shallenberger, Borel, Professors Anthony and Jackson—were electricians of the highest professional training, and the fact that with study they attained the same result by no means proves that the adaptation and successful substitution of a split phase alternating current in place of two or more independently generated was obvious to a person of ordinary skill. It is always difficult to decide where inventive genius ends, and this is particularly the case in an art at best but little understood. As is well said by Judge Severens in the case last cited, 118 Fed. 562, 55 C. C. A. 390:

"The subject is one of the most abstruse and subtle of all the practical sciences, and its pursuit involves the exercise of the keenest intelligence and most patient research that gifted men can bestow. We ought, therefore, to be cautious, when a distinct and practical improvement is made in so useful an art, in denying to the author the reward which the law gives to meritorious inventors."

The patents in suit were also before Judge Lacombe in Westinghouse Electric & Mfg. Co. v. The Catskill Illuminating & Power Co. (C. C.) 110 Fed. 377. In addition to the attack made upon them in other cases, it was further urged that, in a paper read by Professor Ferraris before the Royal Academy of Sciences of Turin, Italy, March 18, 1888, a portion of which was published on April 22d following, at Milan, in L'Elettricita, a journal devoted to electrical subjects, not only was there a full disclosure of the transmission of electric power by means of alternating currents of different phase, but also the use for the same purpose of a dephased split current derived from a single source, the same as in the patents in suit. Upon a due consideration of the opposing proofs, the invention of Tesla was held to be carried back of this publication; but, on appeal, the decision was reversed, the evidence brought forward by the complainants not being considered sufficient for that purpose—(C. C. A.) 121 Fed. 831—a conclusion which was followed by Judge Colt in a case by the same plaintiffs against the Stanley Instrument Co. in the First Circuit, 129 Fed. 140.

This, and the matter of infringement, are the overshadowing questions in the present case.

Before proceeding to a discussion of the proofs, it is necessary to determine what portions, if any, to which objections have been made, are to be excluded. The complainants have brought in from the patent office the record of interference proceedings between Tesla and Ferraris with regard to the first of the two patents in suit, in which the right of the former to priority was sustained. The good faith of this contest is questioned, but, whether adversely conducted or not, it is evident, upon the most cursory consideration, that, as against the defendants, the complainants are entitled neither to the result nor the evidence by which it was obtained. The controversy was between parties with whom the defendants are in no privity, and they cannot, therefore, be affected thereby. Edward Barr Co. v. Sprinkler Co. (C. C.) 32 Fed. 79; Western Electric Co. v. Williams-Abbott Electric Co. (C. C.) 83 Fed. 842.

The defendants have also moved to strike out—or, as we should say, suppress—certain depositions taken by the complainants subsequent to the argument on final hearing. The defendants at that argument asked to have the case reopened for the purpose of taking the deposition of Frederick Darlington, which was granted, leave being given to the complainants at the same time to take evidence in reply. The testimony of Darlington was directed to his relations with Tesla in the summer and fall of 1888, when the latter was experimenting in the Westinghouse laboratory at Pittsburgh, with regard to polyphase motors, the purpose being to show that up to that time Tesla had not evolved his split phase method. In answer to this the complainants introduced the testimony of several witnesses, including Tesla himself, a considerable portion of which, it is claimed, was not confined to a strict reply. So far as a reply to Darlington is concerned this may be true, but it is not of a reply generally. It all, directly or indirectly, bears on the issue raised by the introduction of the Ferraris publication, on which the life of the patent depends, and is too important to be lightly set aside. So far as Tesla was called to contradict Darlington, no exception can be taken. But in going further, and examining him with regard to the date of his invention, the complainants have appropriately supplied a gap in the proofs, which was the subject of serious criticism by the opposing counsel at the argument, and the lack of which in the Catskill Case, according to the opinion of the court, contributed not a little to the adverse result there reached. It is to be regretted that Tesla was not cross-examined, but after consulting the record made by the examiner, and hearing what counsel have to say upon the subject, I am not persuaded that a fair opportunity for it was not given. The motion to strike out, the disposition of which was reserved until this time, must therefore be refused.

The Ferraris publication, as we have seen, was April 22, 1888, and the patents in suit were not applied for until December 8th following. To relieve from this apparent priority, the invention has therefore to be carried back of the earlier date by competent and convincing evidence. Of necessity a high character of proof is required in such cases, and that which was before the court in the Catskill Case was not

upon appeal considered up to the standard. It is more ample here, however, warranting a re-examination of the question. That Tesla, early in May, 1888, had a complete grasp of the split phase idea is established by his application of May 15th for patents, numbers 511,-915 and 555,190, which embody it, the same that were before Judge McPherson in the Scott & Janney Case (C. C.) 97 Fed. 588, already alluded to. This is important evidence, which cannot be contradicted, and I therefore start with it. Not only is the invention beyond question carried back by it to the date named, which is within 23 days of the Ferraris publication, but from the known order of events—a patent not being able to be worked out in a day—ground is thus persuasively laid for an earlier date, if there is any fair evidence to warrant it. In the face of it, I hardly see how we can doubt the accuracy of Mr. Page's statement that Tesla disclosed to him the principles of the invention somewhere in the 1st part of April of that year. His testimony on this point is specific and convincing. In the fall of 1887 and spring of 1888, as he says, he was engaged in developing in the patent office a number of Tesla's inventions, and among them the polyphase motors and transformers, which were patented May 1, 1888. These were prosecuted to an allowance in the early part of April, the final fees, as shown by the books of the firm of which he was a member, having been forwarded to Washington on April 6th. After having secured the allowance of this group, and made arrangements for similar applications in a number of foreign countries for patents to issue simultaneously therewith, Tesla gave him the material for an application, one feature of which was the inducing of one current from another in the operation or construction of a motor, and in this connection disclosed to him his plan for operating his polyphase motors by means of a single split phase circuit. Startled by this revelation, and questioning whether the claims which he had drawn in the pending cases would protect this new improvement, he had a long conference with Tesla, getting from him all that he could as to the different ways he proposed to operate this two-wire system. He also discussed with his partners, Gen. Duncan, now dead, and Mr. L. E. Curtis, of Denver, whether the applications on which patents were about to issue had not better be stopped and amended, and soon afterwards went to Washington to consult with Major Bailey, who had charge of them there. The disclosure of Tesla, which brought about this action, is fixed by Mr. Page as very shortly after the fees in the polyphase motor patents were paid, which, as we have seen, was April 6th. The visit to Washington, according to charges made for it in the books of the firm, was April 27th. Between these dates, on April 18th, is a charge for the application for the invention, in connection with which, as he testifies, Tesla told him of the improvement; and following this, on May 7th, is a charge for the drawings to be used in connection with the application for the first of the split phase patents, filed May 15th, the application itself being charged for May 10th. Mr. Page says that the work on the application was complete when this latter charge was made, and that he must have been engaged on it at least three weeks, which carries it back of the Ferraris date. On what basis this testimony can be passed over or explained away, I

do not see.   While the interval which has elapsed is considerable, the transactions in their nature were such as were likely to impress themselves on his trained professional mind, and his memory has been kept fresh by being called upon to testify on several occasions, beginning with the interference proceedings, which were soon afterwards.   The dates are also substantiated by reference to the billbook of the firm, to which no objection was made.   It seems to me, therefore, convincingly established that prior to April 22d, the date of the Ferraris publication, Tesla had disclosed to Mr. Page, his solicitor, the principle of his split phase adaptation.   We may not be able to assign the exact date, but it must evidently have been somewhere, as Mr. Page says, between the 8th and the 18th of April, the reason why these dates are selected appearing in what has already been said.   The only question, then, is as to the extent of the disclosure, and whether it embraced the patents in suit.   Mr. Page is sufficiently cautious upon this, not to the point of doubt, but of conviction.   "I cannot state now from my recollection," he says, "how many of the specific ways of operating these motors Tesla told me of at that time, but my recollection is entirely clear as to the point that at the conference which I had with him in the early part of April, 1888, and as the result of my closely questioning him, he described to me so that I fully understood the general plan of construction and mode of operation of the three forms of motor to which I have referred.   That is to say, the two-wire induction motor, as we then called it, in. which the currents in one energizing circuit are induced by the currents which pass through the other energizing circuit; secondly, the derivation motor, in which the two circuits have different electrical character—that is to say, one circuit has a higher self-induction than the other circuit; and, thirdly, the long and short core motor, in which the difference of phase in the magnetic effect of the energizing current is obtained by making one set of cores longer or of greater mass than the other set of cores." The two-wire induction motor—that is, the one covered by the application of May 15th—was considered at the time, as he says, of more importance than the other—a circumstance which explains why it was first put into shape; and the other two forms, which he describes, are those of the patent in suit.   Communicating his ideas in this way, as he did, to one who was thoroughly competent to understand and perpetuate them in case of his death, the inventor effectively gave his invention to the world, and by all the authorities he is entitled to bring forward this disclosure now to maintain the priority which he asserts. Walker on Patents, § 70.   The burden is, no doubt, upon him, and the courts are called upon to scrutinize the evidence closely, but they are not required to go out of their way to discredit it coming from a reliable source.   Where an inventor has gone on and developed his invention and secured a patent, there is in fact a certain equity which ought to operate in his favor.   It seems to me that the testimony of Mr. Page, uncontradicted and unshaken as it is, and materially corroborated at points, is sufficient in itself to sustain the priority claimed.   It is said, however, that if Tesla had perfected this invention in the fall of 1887, as he testifies, it is impossible to believe that he would have kept it back from Page until the next April, as he con-

fessedly did, having already revealed it in the meantime, as it is claimed, to Mr. Brown. But the idiosyncrasies of inventors, which do not seem to lessen with their genius, are not to be so reckoned with. Mr. Page says the only explanation he could ever get from Tesla why he did so was that he was afraid if he (Page) knew that the polyphase motors could be run on a single circuit he would not believe the invention amounted to anything, and might not in consequence draw as good claims. This may seem a peculiar, if not an unsatisfactory, reason, but what we are concerned with is that an explanation was demanded and given, and it hardly discredits Mr. Page because it may not be altogether up to the mark.

But the testimony of Mr. Page is by no means all there is upon this subject. Mr. A. S. Brown, who has already been alluded to, an electrical engineer of experience, formerly connected with the Western Union Telegraph Company, became interested in the summer or fall of 1887 in bringing out the original Tesla motor; and he testifies that at once, when it was first brought to his notice, it occurred to him as a great objection that it required two separate currents, not long after which Tesla showed him how it could be operated on a single main line from the generator. The means proposed, as he says, was to put an injunction resistance in one of the circuits derived from the main line, thereby causing a retardation, and producing a difference of phase; another way being to have alternate pole pieces differently wound, one with a finer wire than the other. He further identifies an old experimental motor which he saw operated by Tesla, with derived circuits, one of which was retarded in the way suggested; and he recognizes a photograph of another similarly run, the original of which, it is said, was destroyed in 1895, when the Tesla laboratory was burned. It matters not whether these motors, in and of themselves, have a split phase construction, although I am convinced that one at least has; it was a sufficient disclosure of the system if they were run by that method, as he affirms. The only question as to this witness is one of time. He fixes the occurrence at one place in the summer of 1887, and at another in the summer or fall, and as Tesla, as it is claimed, did not make the discovery until September, doubt is supposed to be thrown on his testimony, and the idea advanced that the information could not have been given him until the next year. But that is not what he says, and whatever be the uncertainty as to the season of the disclosure it cannot consistently be put over a whole year. He unquestionably became interested in the summer or fall of 1887, and, for reasons which he gives, soon after this, in order to remove an important objection, Tesla disclosed to him how it could be overcome. This is the significant point in his testimony, rather than whether it was summer or fall. The probability is that it was the latter, as he says it may have been, and, if so, it was still earlier than the disclosure to Page, and anticipates by months the Ferraris publication of the next spring.

It is urged, however, that the testimony of these witnesses cannot be reconciled with that of Prof. Anthony and Mr. Darlington without assigning to the invention a later date than they give. It seems that early in 1888 the Tesla motor inventions were submitted to Prof. An-

thony as expert adviser of the Mather Electric Company, to whom they had been offered, and as nothing, as it is said, was disclosed by Tesla in that connection about a split phase method of operating his motors, the conclusion is that it had not then been devised.  This might be true if the two were brought together under such circumstances that Tesla would be expected to communicate all his ideas on the subject, and did not do so, but neither assertion is sustained by the proofs. The only patents pending at that time were those of May 1, 1888, covering the original polyphase invention, and there is nothing to show—to say nothing of the probabilities—that the negotiations with the Mather Electric Company, which soon fell off, extended to anything else.   It is true that Mr. Brown says he presumes it was intended to have that company fully informed with regard to all the Tesla patents and inventions, but this, without more, can hardly be accepted as a fact.   Even more conclusive of the matter, however, is it that there is nothing in the record to show that Tesla did not disclose to Prof. Anthony all that could be expected or asked.   What Prof. Anthony says is that he never suggested any other mode of operation than such as involved a magnetic resultant, shifting in position as the phases of the alternating currents changed.   This is an entirely different matter, bearing on another branch of the case, and is of no significance here. I am aware that he testified otherwise in the Catskill Case, but whether he has had occasion to reconsider and recast his statements, we must take them as they now appear, and they leave the defendants nothing on which to build.

Neither do I see that the testimony of Mr. Darlington is of any material aid.   He states that from some time in May to the last of October, 1888, he was intimately associated with Mr. Tesla in the Westinghouse laboratory at Pittsburgh, where the latter was conducting experiments for the purpose of perfecting his alternating current motors and adapting them to commercial use, and that during this period several split phase devices were tried and failed, the argument sought to be drawn being that up to this time Tesla had not advanced with them beyond the experimental stage.   This is absolutely refuted by the uncontrovertible fact that as early as May 15th Tesla applied for the first of his split phase patents; but, passing this by, there is nothing of serious consequence in what he has to say.   Only two experiments are mentioned, one of which was successful, and developed into patent No. 390,820.   The other, as he says, was an attempt to use a single phase current dephased by means of a greatly elongated pair of coils and extra amount of iron in the transformer core, and did not succeed.   Tesla denies the close intimacy asserted, and states that Darlington did not understand the nature of the experiment, and that from the size and character of the test device it was impossible for it to have been used for the purpose which he supposed.   Be that, however, as it may, it merely proves, if true, that the one experiment failed; but it at the same time substantiates that Tesla was fully alive at the time, whenever it was, to the possible adaptation of the split phase system to the operation of his motor, and for all that Darlington knew he might have already worked out all the devices that are now claimed.   That he said nothing about them is entirely without conse-

quence. He was not called upon to do so, and that is all that needs to be said. Inventors are notoriously reticent about their inventions, as they have to be to protect them, and it affords no occasion for comment that Tesla was not more communicative than he seems to have been.

So far I have considered only the proofs, about which no question can be raised, and, basing my decision solely upon them, I am satisfied that the patents should be sustained. The testimony of Tesla outside of this, to which objection is made, goes mainly to the date of his invention, which he fixes as some time in the summer or early fall of 1887, and his disclosures to Mr. Brown soon after that, whose statements he entirely confirms. By calling him, the complainants have no doubt strengthened their case as already pointed out, although they do not have to depend on it; but in the combined evidence thus secured there can be no reasonable doubt as to the clear priority over the Ferraris publication for which they contend. There is other testimony which might profitably be alluded to in this connection, such as that of V. S. Beam, with regard to the inherent split phase character of the old experimental motor (pictured at page 273 of complainants' record), of which I am convinced. But the length to which this opinion has already extended precludes it, and that to which I have referred must suffice.

The question of infringement still remains. At the time suit was brought the defendant Roberts was engaged at Philadelphia in the sale of Gutmann recording watt meters, as agent for the Sangamo Electric Company, of Springfield, Ill., by whom they were made. There was some controversy at the outstart as to whether sufficient evidence of an infringing sale by him had been produced; but the complainants, by permission, having taken supplementary proofs upon this point, it was abandoned, and the Sangamo Electric Company, at their own request, have now been made parties defendant, with all the responsibility which that entails.

It is contended that a meter is not a motor, and that on this ground, of itself, no infringement can be charged. But, as pointed out by Judge Lacombe in the Catskill Case (C. C.) 110 Fed. 377, while the Tesla patents contemplate the production of power, they are silent as to the amount of it; and as a meter armature rotates against the action of a permanent magnet, and turns a spindle which operates the registering devices, the production of some power is necessarily involved. It is somewhat aside from the question, but still it is a circumstance that Gutmann himself, in accordance with whose patents the meters in question are constructed, recognizes and claims therein that his device may be used for power purposes also. No doubt the strict object of a meter of this class is to measure and record the element which passes through or actuates it, gas, water, the electric current, or whatever it may be; but where, as here, it is, in mechanical construction, nothing more than an adapted motor with meter attachments, it cannot escape infringement on that plea. There is nothing in conflict with this, when rightly considered, in what is said in the National Meter Co. v. The Neptune Meter Co. (C. C.) 122 Fed. 75. The attempt there made was to defeat a special safety appliance of a

water meter by references drawn from the general motor art, and it was in that connection that it was held that the two were not the same.

The meter manufactured by the defendant company is portrayed in the accompanying figure, and is described as follows: AA are two coils of fine wire, wound upon laminated iron cores, whose poles are presented to the lower part of an aluminum armature, D, and embrace the rear half of it, the magnetic circuit between the poles being continued by a crescent shaped laminated core within the cylinder. BB are coils of coarse wire on opposite sides of the upper part of the armature, above and in a plane parallel with the poles of the cores, CC. The armature, D, is cylindrical, and is mounted on a vertical shaft, capable of rotation, to which a registering device, R, is attached. By diagonal slots sawed in its surface and slanting upwards to the left at considerable of an angle, the exterior of the cylinder is divided up into predetermined circuits. To the bottom of the cylinder is attached a disk or ring, E, which rotates with the armature, and is located be-

tween the poles of a permanent magnet, M, thereby furnishing a load for the meter which varies with the speed of the rotations of the armature, causing such rotations to be proportionate to the energy passed through it, and furnishing a basis for measuring the same thereby. The two sets of coils, it will be noted, are differently constructed, BB being composed of a relatively small number of turns of coarse wire without a core, the recognized construction where a relatively low self-induction, which will not dephase the alternating current, is desired; while the coils, AA, on the other hand, are made up of a large number of turns of fine wire wound about an iron core, a well-known way for bringing about a large self-induction, with the effect of greatly delaying or dephasing the current. The current which severally energizes the two circuits proceeds from a single source, but is divided before it reaches them, one part passing through the coarse coils, BB, and thence through the lamps to be measured, and so back into circuit, while the other flows through the coils, AA, to the same point. The former is spoken of as being in series, and the latter as in shunt, the connection with the shunt windings being preferably taken off from the circuit first, and that of the series coils afterwards, or on the load side, by which arrangement everything is measured except the inconsiderable current passing through the shunt coils. The construction so described is, in effect, a motor in which the armature is operated upon by two independent energizing circuits, produced by passing through them a divided and dephased alternating current derived from a single source, thus apparently realizing the patents in suit.

Before definitely reaching this conclusion, however, some further observation of them is required. The two claims of No. 511,559 are as follows:

"(1) The method of operating motors having independent energizing circuits, as herein set forth, which consists in passing alternating currents through both of the said circuits, and retarding the phases of the current in one circuit to a greater or less extent than in the other. (2) The method of operating motors having independent energizing circuits, as herein set forth, which consists in directing an alternating current from a single source through both circuits of the motor, and varying or modifying the relative resistance or self-induction of the motor circuits, and thereby producing in the currents differences of phase, as set forth."

The following are the first two claims of No. 511,560, which also are relied on:

"(1) The combination with a source of alternating currents, and a circuit from the same, of a motor having independent energizing circuits connected with the said circuit, and means for rendering the magnetic effects due to said energizing circuits of different phase, and an armature within the influence of said energizing circuits. (2) The combination with a source of alternating currents and a circuit from the same of a motor having independent energizing circuits connected in derivation or multiple arc with the said circuit, the motor or energizing circuits being of different electrical character, whereby the alternating currents therein will have a difference of phase, as set forth."

By the first of these the method or system was patented, and by the last certain special forms devised for carrying it out. Both adopt as a necessary foundation the "Tesla effect," exemplified in his original invention, to which they are merely an adaptation of the split phase

idea. To realize either there must, therefore, exist, in any infringing device, a resultant action of the two energizing circuits. This, as held by Judge Brown in the Royal Weaving Case (C. C.) 115 Fed. 733, before referred to, is the limitation imposed by the Dumesnil and Cabanellas patents, and is in fact all that is claimed by Tesla in describing his invention in this and other patents. But it is conceded, or, if not conceded, satisfactorily proved, that the eddy currents formed in the armature under the field poles, AA, at one end, are deflected by the slots in the cylinder so as to come under the influence of the field poles, BB, of differing phase at the other, and that it is the resultant magnetic effect of the two that causes the rotation of the armature. That it is this resultant effect that is sought and obtained is manifest, else why the deflecting slots, the only function of which is to extend the eddy currents from one to the other? Cut this off, or dispense with one set of poles, and you have no rotation, or only a most feeble one, explainable on other principles. Or if the slots are made parallel to the axis of rotation, or, if with their angularity retained, the two sets of poles are set at an angle exactly opposite thereto, there is the same lack of result. The angularity of the poles when in the same horizontal plane must be retained when they are in independent planes, or it must be made up by an equivalent angularity of the slots, so that each set of poles shall always operate on the same armature bars. Reversing the angle of the slots reverses the relative position and action of the poles, causing the armature to turn in the opposite direction. The action which is thus secured is theoretically produced in each instance by the rotary progression of an ideal pole, the resultant of the two sets of poles acting independently. That this is dependent on the intermediate eddy currents being deflected along the armature, from one set of poles to the other, does not affect the character of the action or the result; or, in other words, it is no less a resultant because one set of poles acts in one plane and the other in another. The supposed mechanical resultant of a parallelogram of forces is a convenient diagrammatic fiction to illustrate a physical effect, and may exist whether the co-operating forces act in the same plane or in planes that are parallel, and there is nothing to impose any stricter limit on that which is relied upon here. The action of the two energizing circuits has been spoken of graphically as a whirling field of force, and compared to that of a magnet rotated about the armature, which no doubt conceives of the resultant as moving in a single plane at right angles to the axis. But the inventor himself simply speaks of it as a rotary progression of the poles or points of magnetic effect, and this, as already stated, is satisfied, although the energizing poles act in independent planes, provided only there is a conjoint magnetic influence to produce a rotary effect. The Tesla motor as an invention was first in its own peculiar field, and is entitled in consequence to a liberal application of the doctrine of equivalents, and of the substantial equivalency of the defendants' device I am fully convinced. The fundamental idea is appropriated, whatever improvement or adaptation there may be besides. Nor can I see that there is any difference whether we consider the eddy currents, which are carried by means of the slots from the lower to the upper part of the armature, as there

attracted or repelled; that is to say, as drawn tangentially or pushed tangentially by the field poles under whose influence they are so brought. The significant thing in each is the conjoint or resultant action of the two opposite sets of poles, the magnetic influence, whether of attraction or repulsion, waxing and waning, and shifting progressively about the armature, of the existence of which there can be little doubt.

It is persuasive of the equivalency of operation which is so contended for, although by no means conclusive of it, that Tesla, in a patent applied for May 20, and granted December 3, 1889, suggests that where the two main or primary sets of energizing poles there employed are at right angles, and a single armature core is used, it is to be wound in closed circuit from end to end, but that if the poles are in line—that is, in vertical plane with each other, as in the present meter—there should be an angular displacement of the armature coils. This equivalency is assumed without explanation, as being within the terms of the invention. So, in another patent applied for March 26, 1890, and granted August 5th following, the two sets of field poles there found are located at either end of the armature, out of line with each other, forming practically two fields of force, as it is said, alternately disposed, with the poles of one set or field opposite the spaces of the other. Much in the same way Gutmann, in the patent under which the meters in controversy are constructed, shows an armature with straight slots and poles out of line, interchangeably with slanting slots and poles in line. Other confirmations of the equivalency of the two arrangements with that of a Tesla motor, as well as with each other, could be drawn from this record, but these must suffice. They establish to my satisfaction the general infringing character of the defendants' meter as is charged.

A special defense of noninfringement is made, however, as to the second claim of patent No. 511,560, on the ground that the energizing circuits in these meters are not in derivation or multiple arc with the circuit from the source of supply; and the decision of Judge Lacombe in the Catskill Case is relied upon, where it was held that the Scheefer meter did not infringe, both energizing circuits not being connected in multiple arc with the main circuit. This decision is said to be the result of a mistake as to the exact character of the circuit connection, but of that I shall not undertake to speak. In the case before me, which is illustrated by the accompanying diagram, the circuit from

the generator is divided, one branch being taken off to go to one set of poles and the other to the other, both uniting again after the latter has passed through the lamps to be measured. This would seem to make each of the branches which constitute the energizing circuits to be in derivation or multiple arc with that from the source of supply, realizing the terms of the patent. While the so-called series coils, DD, may be in series with the lamps, LL, the lamps are certainly in multiple with the circuit from the generator, and so of necessity also are the coils. The distinction attempted by Prof. Jackson, and particularly the suggestion that the insertion in one of the branch circuits of a set of incandescent lamps destroys the derivative relation, is too refined, as it seems to me, to stand.

Finding, therefore, that the patents in suit are valid and have been infringed, a decree is directed in favor of the complainants in the usual form, with costs.